UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ALAN MILLS, | CASE NO. C25-0742JLR |
| Plaintiff, | ORDER |
| v. | |
| LAUREL D. CRONK MONLUX, | |
| Defendant. | |

## I.    INTRODUCTION

Before the court is Defendant Laurel D. Cronk Monlux's motion for summary judgment (MSJ (Dkt. # 99); Reply (Dkt. # 109)) and *pro se* Plaintiff Alan Mills's opposition thereto (Resp. (Dkt. # 103)).  Mr. Mills also filed a surreply in which he moves the court "to strike, or decline to consider" portions of Ms. Monlux's reply, to which Ms. Monlux responded at the direction of the court.  (Surreply (Dkt. # 111); Surreply Resp. (Dkt. # 114); *see* 4/7/26 Order (Dkt. # 113).)  The court has considered the parties' submissions, the relevant portions of the record, and the governing law.

ORDER - 1

Being fully advised,[1] the court DENIES Mr. Mills's motion to strike and GRANTS Ms. Monlux's motion for summary judgment.

## II.   BACKGROUND

Mr. Mills is the parent of A.K., a now-graduated member of the Ingraham High School Girls' Varsity Tennis Team. (*See* 2/27/26 Monlux Decl. (Dkt. # 100) ¶ 2.) He alleges that Ms. Monlux, Head Tennis Coach of his daughter's team, violated his free speech rights under the United States and Washington constitutions by sending an email message reminding parents and spectators "that they are not allowed to coach players" during matches but are allowed to clap and provide "[w]ords of encouragement," and by enforcing that rule at a tennis match. (*See generally* Compl. (Dkt. # 1); Monlux Decl. ¶ 9, Ex. B (3/19/24 Monlux Email).) Below, the court sets forth the relevant factual and procedural background of this matter.

### A.   Factual Background

Ms. Monlux is employed as a tennis coach by Seattle Public Schools ("SPS"). (Monlux Decl. ¶ 2.) Ms. Monlux coached A.K. during the 2023-2024 and 2024-2025 seasons. (*Id.* ¶¶ 2, 19.) Although A.K. graduated from high school in 2025, Mr. Mills asserts that he intends to continue attending Ingraham girls' tennis matches as a spectator. (*Id.* ¶ 19; Mills Decl. (Dkt. # 104) ¶¶ II.1.b, II.22.a.)

On or about March 18, 2024, one of the Ingraham tennis players told Ms. Monlux that she felt distracted and had difficulty concentrating during a match because her

---

[1] Neither party requests oral argument, and the court finds that oral argument would not assist it in resolving the motions. *See* Local Rules W.D. Wash. LCR 7(b)(4).

ORDER - 2

doubles partner's father—Mr. Mills—had been coaching and talking to players from the sidelines. (Monlux Decl. ¶ 7.[2]) According to Ms. Monlux, the student did not feel comfortable approaching Mr. Mills directly and wished to remain anonymous. (*Id.*) The student asked Ms. Monlux to help prevent the distracting behavior from occurring at future matches. (*Id.*)

The next day, March 19, 2024, Ms. Monlux sent an email message to the parents of team members stating, in relevant part:

> Hello Ram tennis families and supporters, . . . .
>
> . . . . I would like to remind parents and spectators that they are not allowed to coach players. This is a rule that is enforced by [the Washington Interscholastic Athletics Association ("WIAA")] and the Metro League,[3] so please understand. It can be confusing to players if they are receiving coaching from a parent and then the coach comes to say something else. We do not need too many voices in their heads. Sometimes I am alone with coaching duties so I must split my time among 6 courts. If you see something that needs attention, please flag me down and let me know what you are seeing. I can then communicate this to the players if I believe it needs to be addressed.
>
> Words of encouragement and clapping are allowed and always appreciated!
>
> Thank you for your understanding! We do appreciate your support!

(*See* 3/19/24 Monlux Email.)

---

[2] As explained below, the court denies Mr. Mills's motion to strike purported hearsay included in Ms. Monlux's declaration.

[3] The WIAA "is an organization that functions as a governing body for high school teams across Washington by establishing informal and formal rules of conduct and play across high school sports and activities to promote fair and equitable play and ensure consistency across competitive sports teams in Washington." (Monlux Decl. ¶ 4.) The Metro League "is a high school athletic conference organization, which further sets forth requirements that teams must abide by during interscholastic competitions, including tennis matches against other high school teams." (*Id.*)

ORDER - 3

After receiving this message, which Mr. Mills calls the "Monlux Speech Suppression Policy" (*see* Mills Decl. at 3), Mr. Mills emailed Ms. Monlux to inquire about the source of the rule prohibiting coaching by parents and spectators.  (Monlux Decl. ¶ 10, Ex. C.)  Ms. Monlux responded that she was informed at a pre-season Metro League coaches' meeting that "only 'officially recognized coaches are permitted to coach'" and directed Mr. Mills to sections of the Metro League Tennis Rules and Resources and the WIAA Handbook.  (*Id.*)  Ms. Monlux added:

> I do think it is important to honor this, as it does become confusing to players and can be distracting if there are too many voices going on.  I certainly appreciate any observations you can give me and I can always relay that to the kids.

(*Id.*)  Mr. Mills contends, however, that "[n]o WIAA, Metro League, SPS, or other rule restricts spectator speech to 'encouragement' or prohibits speech that could be construed as 'coaching.'"  (Resp. at 14; *see also* Mills Decl. ¶ II.6.a.iv (asserting that the WIAA Handbooks do not contain language stating that spectators must limit their speech to "words of encouragement and clapping" or "must avoid any speech that is 'coaching'"); *id.* ¶¶ II.6.b.ii-iii (making the same assertions regarding the Metro League tennis rules).)

Ms. Monlux and Mr. Mills continued to correspond about Ms. Monlux's March 19, 2024 email and the source of her admonition not to coach players.  (*See* Monlux Decl. ¶¶ 11-13, Exs. D-F (emails between Mr. Mills and Ms. Monlux).)  Mr. Mills made clear to Ms. Monlux that he did not agree with her interpretation of the WIAA and Metro League rules and questioned her about the rules, the reasons she sent her email, and whether she had observed any coaching by parents or spectators at past matches.  (*See*

ORDER - 4

Monlux Decl., Ex. D.)  Ms. Monlux responded that parent and spectator coaching was discussed at a Metro League coaches' meeting and that she had not witnessed any parent coaching at Ingraham.  (*See id*., Ex. E.)  She explained that she sent her email to all parents after receiving a "complaint/concern from an individual who wishes to be anonymous" that an Ingraham parent had engaged in distracting conduct.  (*Id.*)

On March 21, 2024, Mr. Mills sent Ms. Monlux an email accusing her of violating the laws of professional conduct for teachers and the First and Fourteenth Amendments to the United States Constitution "by flagrantly and unprofessionally misrepresenting the WIAA and Metro League rules regarding parent coaching" in her March 19, 2024 email and threatening that he would sue her if she failed to "walk back" the statements she made in that email.  (Mills Decl. ¶ II.10.a, Ex. A.6; Monlux Decl. ¶ 13, Ex. F.)  Ms. Monlux did not respond; instead, she forwarded the email to her supervisor, Ingraham High School Athletic Director Michael Wentzel.  (*See* Mills Decl. ¶ II.10.b; Monlux Decl. ¶ 13.)  Ms. Monlux asserts she had no further direct communication with Mr. Mills until the 2024-2025 school year.  (Monlux Decl. ¶¶ 13-16.)

Before the 2024-2025 season began, Mr. Mills and all other parents of Ingraham tennis players signed an acknowledgement of spectator expectations and standards of sportsmanship.  (*See* Monlux Decl. ¶ 15, Ex. G.)  These expectations included:

//

//

//

//

ORDER - 5

- Spectators will respect all coaches, umpires/officials, adminstrators, and other spectators
  - Do not engage in physical or verbal intimidation, or abuse towards any player, official, umpire, coach, or spectator
. . .
- Spectators should remain in their designated seating section
  - Comply with any directives from facility supervisors, administrators, and/or event staff
- Spectators will cheer for their team in a positive manner
  - Do not [] use disparaging remarks towards the other team(s)

(*Id.*)

On March 19, 2025, Mr. Mills attended a tennis match between the Ingraham and Nathan Hale High School girls' varsity tennis teams at Meadowbrook Playfield Park, a public park that serves as Nathan Hale's home court.  (Monlux Decl. ¶ 16; Mills Decl. ¶ II.13.a.)  Nathan Hale's coach announced before the match that spectators were expected to stand away from the fence surrounding the court.  (Monlux Decl. ¶ 16.)

During the first half of the match, Nathan Hale's coach approached Mr. Mills, who was standing on a concrete strip near the fence watching his daughter's match, and "told [him] to 'get off the fence[.]'"  (Mills Decl. ¶ II.13.c.)  Mr. Mills asked the coach who she was, assured her that he had not touched the fence, and continued watching the match.  (*Id.*)  According to Mr. Mills and A.K., Mr. Mills was cheering for A.K. and her opponent, did not converse with either player, and was not the only spectator standing on the concrete strip.  (*Id.* ¶ II.13.b; A.K. Aff. (Dkt. # 48) ¶ III.3.)

At some point during the match, Nathan Hale's coach expressed frustration to Ms. Monlux that Mr. Mills was not standing in the area designated for spectators and was

ORDER - 6

coaching from the sidelines, and told Ms. Monlux to "deal with [her] parent." (Monlux Decl. ¶ 16.) According to Mr. Mills:

> Ms. Monlux walked up to me and, [] without preamble, told me to step away from the fence. And she indicated that I should step several yards away from the fence, even though other parents were standing close to the fence just as I was doing. I responded "no" to Ms. Monlux's demand. I asked her why she was making such a demand. Ms. Monlux responded that I was not allowed to coach. . . . During the Nathan Hale match, Ms. Monlux also said that I was being "disrespectful" to both the Nathan Hale coach and to Ms. Monlux. In response to Ms. Monlux's statement that I was not allowed to coach, I calmly told Ms. Monlux that I was not a coach. I also told Ms. Monlux what I had said to the Nathan Hale coach—i.e., I had merely asked who she was—and that I found it difficult to understand why such a question was "disrespectful". Ms. Monlux then told me that I was damaging my child. She then loudly told me, "Sue me!". She then shouted, "You will lose!" and walked away.

(Mills Decl. ¶ II.13.e (internal citations omitted).) Mr. Mills represents that he "never said or [did] anything negative, disrespectful, intimidating, or abusive to Ms. Monlux." (Mills Decl. ¶ II.13.e; *see also* A.K. Aff. ¶ IX.IV (same).) Mr. Mills remained near the fence for the remainder of the match. (Monlux Decl. ¶ 16.)

The next day, March 20, 2025, Ms. Monlux spoke to A.K. after tennis practice. (*See* Mills Decl. ¶ II.15.a; A.K. Aff. ¶ V.1; Monlux Decl. ¶ 17.) According to A.K., Ms. Monlux told her that her father had broken clearly established rules and disagreed with Ms. Monlux about the interpretation of those rules. (A.K. Aff. ¶ V.2.)

On March 21, 2025, Mr. Mills sent an email to Ms. Monlux and Mr. Wentzel regarding Ms. Monlux's conversation with A.K. and Mr. Mills's recollection of the Nathan Hale tennis match. (Mills Decl. ¶ II.17.a, Ex. A.11.) Neither Ms. Monlux nor Mr. Wentzel responded. (*Id.* ¶ II.17.b.) Mr. Mills continued to attend Ingraham tennis

ORDER - 7

matches for the remainder of the season, and Ms. Monlux never again approached Mr. Mills about his conduct at these matches.  (*See* Monlux Decl. ¶¶ 18, 20, 21; *see also* Mills Decl. ¶ II.22.a (stating that Mr. Mills attended each of A.K.'s home tennis matches and most of the away matches during the 2024-2025 school year).)

**B.    Procedural History**

Mr. Mills filed this lawsuit on April 21, 2025.  (*See generally* Compl.)  He alleges that Ms. Monlux, in her individual and official capacities, violated his free speech rights under the First Amendment to the United States Constitution and Article 1, Section 5 of the Washington State Constitution (*id.* §§ V.A-B).  He seeks declarations that Ms. Monlux's "actions in suppressing [his] speech" violated his state and federal free speech rights and that the "Monlux Speech Suppression Policy is invalid and does not accurately represent the WIAA and Metro League[] Rules." (*Id.* § VI.A.)  He also seeks injunctive relief requiring (1) Ms. Monlux "to write an email from her [SPS] email address to the parents of students on the 2023-2024 and 2024-2025 Ingraham varsity tennis teams retracting the statements" in her March 19, 2024 email; and (2) Ms. Monlux and SPS "to implement mandatory training on First Amendment and Washington State Constitution protections for parental and spectator speech and school athletic events." (*Id.* § VI.B).  Finally, Mr. Mills seeks nominal damages of $1.00 and punitive damages based on Ms. Monlux's alleged reckless indifference to his free speech rights.  (*Id.* §§ VI.C-D.)

On December 22, 2025, Mr. Mills moved for leave to amend his complaint to join SPS, WIAA, Metro League, and Mr. Wentzel as Defendants.  (MTA (Dkt. # 95).)  The court denied the motion because the deadline for joining parties had expired (*see* Sched.

ORDER - 8

Order (Dkt. # 32)), and Mr. Mills failed to show good cause to extend that deadline because his complaint, filings, and representations at oral argument made clear that he had been aware since the beginning of this litigation that SPS was Ms. Monlux's employer and that WIAA and Metro League had promulgated the rules to which Ms. Monlux referred him (*see generally* 2/10/26 Order (Dkt. # 98)).

Ms. Monlux filed her motion for summary judgment on February 27, 2026. (*See generally* MSJ.) The motion is fully briefed and ripe for decision.

### III.    ANALYSIS

Below, the court begins by setting forth the standard of review for motions for summary judgment, and then considers Mr. Mills's motions to strike and Ms. Monlux's motion for summary judgment. In doing so, the court is mindful that Mr. Mills is proceeding *pro se* and, therefore, the court is required to construe his filings liberally. *See McGuckin v. Smith*, 974 F.2d 1050, 1055 (9th Cir. 1992). Nevertheless, *pro se* litigants are bound to follow the same rules of civil procedure that govern represented parties. *Muñoz v. United States*, 28 F.4th 973, 978 (9th Cir. 2022).

### A.    Standard of Review

Summary judgment is appropriate if the evidence viewed in the light most favorable to the nonmoving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists

when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To carry her burden, Ms. Monlux "must either produce evidence negating an essential element of [Mr. Mills's] claim or defense or show that [Mr. Mills] does not have enough evidence of an essential element to carry [his] ultimate burden of persuasion at trial." *Jones v. Williams*, 791 F.3d 1023, 1030-31 (9th Cir. 2015) (citation omitted). If Ms. Monlux meets her burden of production, the burden then shifts to Mr. Mills to identify specific facts from which a factfinder could reasonably find in his favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250. "This burden is not a light one." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). A "party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record[.]" Fed. R. Civ. P. 56(c)(1)(A).

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party[.]" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks and citation omitted). It may not weigh evidence or make credibility determinations. *Anderson*, 477 U.S. at 249-50. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott*, 550 U.S. at 380 (citation omitted); *see also Celotex*, 477 U.S. at 322 (holding that the court shall grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

ORDER - 10

## B.   Motions to Strike

In his response to Ms. Monlux's motion for summary judgment, Mr. Mills asks the court to "disregard or strike" portions of Ms. Monlux's declaration as inadmissible. (Resp. at 19-21.)  In his surreply, Mr. Mills moves the court "to strike, or decline to consider" eight purportedly new arguments and 13 purportedly improper assertions that Ms. Monlux made in her reply. (*See generally* Surreply.)  The court denies Mr. Mills's motions to strike.[4]

First, the court declines to strike Ms. Monlux's declaration.  Mr. Mills objects that the declaration contains inadmissible hearsay, inadmissible lay opinion regarding tennis rules and customs, internal contradictions, and inadmissible vague terms. (Resp. at 19-21.)  "To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) (citation omitted).  Thus, a court may consider evidence that is not presented in an admissible form at summary judgment if that evidence may be presented in an admissible form at trial.  *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003).  For example, the content of hearsay statements may be admissible at trial if

---

[4] Mr. Mills also filed a document titled "Plaintiff's Evidentiary Objections to the Declaration of Laurel Monlux" ("Objections"). (Objs. (Dkt. # 102).)  Requests to strike material contained in a motion, however, "shall be included in the responsive brief[.]"  Local Rules W.D. Wash. LCR 7(g).  Thus, any requests to strike that Mr. Mills makes in his Objections are improper.  Furthermore, motions for summary judgment and responses thereto are limited to 8,400 words in length.  Local Rules W.D. Wash. LCR 7(e)(4).  If the court were to consider Mr. Mills's Objections, it would effectively allow Mr. Mills far more than 8,400 words to respond to Ms. Monlux's motion.  Accordingly, the court does not consider Mr. Mills's Objections in evaluating Ms. Monlux's motion for summary judgment.

ORDER - 11

the declarants testify. *See id.* Mr. Mills's objections that Ms. Monlux's declaration contains internal contradictions and inadmissible vague terms are based on his view of the background facts rather than on evidentiary standards. Finally, the court did not rely on Ms. Monlux's discussion of tennis customs in deciding this motion.

Second, the court declines to strike arguments that Mr. Mills asserts Ms. Monlux raised for the first time in reply. (*See* Surreply at 2-5.) Having reviewed the parties' briefing, the court finds that the purportedly new arguments are responsive to arguments Mr. Mills raised in his response and are properly included in Ms. Monlux's reply.

Finally, the court declines to strike the allegedly improper assertions Ms. Monlux made in her reply. (*See id.* at 6.) Mr. Mills argues that Ms. Monlux made "numerous assertions . . . that are plainly contradicted by the summary judgment record." (*Id.*) Most, if not all, of these purportedly unsupported assertions are simply arguments in support of Ms. Monlux's motion for summary judgment. That Mr. Mills does not agree with them is not grounds to strike them from the reply.

**C.     First Amendment Claims**

Mr. Mills raises his First Amendment discrimination and retaliation claims under 42 U.S.C. § 1983. (*See* Compl. § V.A.) To prevail on a § 1983 claim, Mr. Mills must establish that Ms. Monlux violated a right secured by the Constitution and laws of the United States, and that Ms. Monlux was acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). The court considers each claim below.

//

//

ORDER - 12

### 1.    Content-Based Discrimination

Mr. Mills asserts that Ms. Monlux's March 19, 2024 email, which he characterizes as "prohibit[ing] parents who are watching Ingraham varsity tennis matches from uttering phrases interpretable as 'coaching', while permitting 'words of encouragement and clapping[,]'" was a content-based policy suppressing speech in violation of the First Amendment.  (Resp. at 11 (defining the "Monlux Speech Suppression Policy"); *see also id.* at 22 ("The core issue is whether Ms. Monlux—acting under color of state law as a public-school employee—violated Mr. Mills's rights under the First Amendment . . . by promulgating and enforcing a content-based restriction on his non-disruptive spectator speech").)  Ms. Monlux argues that she is entitled to summary judgment because (1) she did not engage in state action giving rise to § 1983 liability; (2) Mr. Mills's claims do not involve protected speech; (3) any limits she placed on speech are constitutional; and (4) Mr. Mills cannot show that he suffered a cognizable injury.  (MSJ at 8-18.)

#### a.    State Action

Ms. Monlux asserts that although she was acting in her official capacity when engaging in her work as a high school coach, "she never purported to establish an official policy or otherwise t[ake] action that would constitute state action."  (MSJ at 9-10.)  The court agrees.  The cases Mr. Mills relies upon to argue that Ms. Monlux's March 19, 2024 email "created a new policy with legal effect by chilling speech" involved statutes, regulations, and formal governmental policies.  (*See* Resp. at 28); *see, e.g., Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 159 (2015) (town code regulating display of signs); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 824 (1995) (state

university guidelines regarding disbursements from a student fund); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 15 (1983) (school board policy granting access to teachers' mailboxes only to the teachers' bargaining unit); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 504 (1969) (school policy prohibiting the wearing of armbands protesting the Vietnam War); *Dombrowski v. Pfister*, 380 U.S. 479, 483 (1965) (criminal statute restricting speech). In contrast, Ms. Monlux's March 19, 2024 email, by its terms, served as a "reminder" to parents and spectators of rules of conduct promulgated by the WIAA and the Metro League. (*See* 3/19/24 Monlux Email.) Nothing in the language of that message can reasonably be read as purporting to establish a new policy restricting speech, and Mr. Mills cites no authority for the proposition that an email message "reminding" parents of rules promulgated by other entities can constitute an official government policy. Summary judgment in favor of Ms. Monlux is warranted on this basis alone.

### b. Restrictions on Speech

Even if Ms. Monlux's March 19, 2024 email could be read as a government policy, the restrictions it places on speech pass constitutional muster. Whether restrictions on speech are permissible depends on the forum in which the speech is made. The Supreme Court has classified forums into three categories: traditional public forums, designated public forums, and limited public forums. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469-70 (2009). Traditional public forums include places like streets and public parks which have traditionally "been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* at 469

ORDER - 14

(quoting *Perry Educ. Ass'n*, 460 U.S. at 45) (internal quotation marks omitted).  "[A] government entity may create 'a designated public forum' if government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose." *Id.* (citation omitted).  In traditional and designated public forums, content-based restrictions on speech are prohibited, unless they satisfy strict scrutiny:  the restrictions must be narrowly tailored to serve a compelling government interest and restrictions based on viewpoint are prohibited.  *Id.* at 469-70 (citation omitted).

A government entity may also create a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects.  *Id.* at 470 (citing *Perry Educ. Ass'n*, 460 U.S. at 46 n.7).  In a limited public forum, a government entity may impose content-based restrictions on speech that are reasonable and viewpoint neutral.  *Id.* (citing *Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 106-07 (2001)).  This inquiry "focuses on whether the limitation is consistent with preserving the property for the purpose to which it is dedicated." *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 967 (9th Cir. 1999) (citation omitted).

The court agrees with those courts that have held that high school athletic events should be treated as limited public forums.  *See, e.g.*, *DiLoreto*, 196 F.3d at 968; *Fellers v. Kelley*, No. 24-CV-311-SM-AJ, 2025 WL 1098271, at *10 (D.N.H. Apr. 14, 2025); *Frierson v. Reinisch*, 806 F. App'x 54, 58 (2d Cir. 2020); *Zeyen v. Pocatello/Chubbuck Sch. Dist. #25*, No. 4:16-CV-00458-DCN, 2018 WL 2224053, at *8 (D. Idaho May 15,

//

//

2018).[5]  Thus, as long as the restriction on speech can reasonably be justified in light of the purposes of the forum, Ms. Monlux's purported policy restricting "coaching" speech is constitutional.

"School officials have comprehensive authority, consistent with fundamental constitutional safeguards, to maintain an environment suitable for academic and extra-curricular learning by all students."  *Blasi v. Pen Argyl Area Sch. Dist.*, 512 F. App'x 173, 175 (3d Cir. 2013) (citing *Tinker*, 393 U.S. 503).  In the public school athletics context, "[s]chool officials have a legitimate interest in affording student athletes 'an educational environment conducive to learning team unity and sportsmanship and free from disruptions that could hurt or stray the cohesiveness of the team.'"  *Id.* (quoting *Wildman v. Marshalltown Sch. Dist.,* 249 F.3d 768, 771 (8th Cir. 2001)); *see also id.* at 174, 176 (holding that spectator guidelines prohibiting spectators from "berating players, coaches, officials, or other spectators" were "reasonably designed to enhance the

---

[5] Mr. Mills asserts, without citation to authority, that tennis matches conducted at public parks, such as the Nathan Hale match held at its home courts at Meadowbrook Playfield Park, should be treated as traditional public forums. (*See* Resp. at 30.)  The court disagrees.  As the court reasoned in *Mahgerefteh v. City of Torrance*:

> [A] public high school lacking an adequately large venue might properly reserve a public park in which to hold its commencement ceremony.  It cannot reasonably be suggested that in doing so the school obligates itself to allow members of the public at large to give commencement speeches.  Although the park itself may be a traditional public forum when not reserved for another use, a high school commencement ceremony is not a public forum, and nothing in the First Amendment prohibits the school from limiting commencement speakers to those chosen by the school itself.

324 F. Supp. 3d 1121, 1132 (C.D. Cal. 2018); *see also id.* at 1133 (holding that the state "has the ability to temporarily reserve part of a public forum for its own particular use").  The court adopts this reasoning and holds that Ingraham tennis matches held at public tennis courts that have been reserved for high school tennis league play should be treated as limited public forums.

ORDER - 16

educational and athletic experience of plaintiff's sons as well as that of other students participating in the program").

Mindful of these principles, the court concludes that Ms. Monlux's March 19, 2024 email message, if it can be read as a policy, was reasonably designed to support the athletic experience of students participating on the Ingraham girls' varsity tennis team. The stated purpose of the prohibition on spectator coaching was to prevent such statements from confusing or distracting student athletes during a match. (*See* 3/19/24 Monlux Email ("It can be confusing to players if they are receiving coaching from a parent and then the coach comes to say something else."); Monlux Decl., Ex. C ("I do think it is important to honor this, as it does become confusing to players and can be distracting if there are too many voices going on.")); *see, e.g.*, *Blasi*, 512 F. App'x at 176 (concluding that school's spectator guidelines "permit[] the coach and players to focus on the game when at hand, without distraction of competing views of the strategies and tactics best calculated to win"). In addition, the policy does not preclude or prohibit coaching from parents and spectators. Instead, by directing parents and spectators to share coaching feedback with Ms. Monlux, the policy regulates the time, place, and manner in which spectators can provide such feedback during a match. (*See* 3/19/24 Monlux Email ("If you see something that needs attention, please flag me down and let me know what you are seeing. I can then communicate this to the players if I believe it needs to be addressed.")); *see, e.g.*, *Blasi*, 512 F. App'x at 176 (noting that the spectator guidelines did not preclude or prohibit criticism of coaches or other players but instead regulated the time, place, and manner of expressing such concerns "in a way necessary to

ORDER - 17

manage an effective and efficient basketball program"). Therefore, the court concludes that no reasonable juror could find that Ms. Monlux's purported policy disallowing coaching statements but allowing words of encouragement creates an unconstitutional burden on speech. Accordingly, the court grants Ms. Monlux's motion for summary judgment on Mr. Mills's First Amendment discrimination claim.

2.    First Amendment Retaliation

Mr. Mills asserts that Ms. Monlux retaliated against him in violation of the First Amendment by confronting him and "demanding compliance" at the March 19, 2025 Nathan Hale tennis match. (Resp. at 34.) Ms. Monlux argues that Mr. Mills's retaliation claim fails because he cannot demonstrate that she subjected him to an adverse action that would chill the speech of an ordinary person. (*See* MSJ at 17-18.)

To prevail on his First Amendment retaliation claim, Mr. Mills must demonstrate that (1) he engaged in constitutionally protected activity; (2) Ms. Monlux's actions would "chill a person of ordinary firmness" from continuing to engage in the protected activity; and (3) the protected activity was a substantial or motivating factor in Ms. Monlux's conduct. *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006) (citation omitted)).

The court finds *Johnson v. Washoe County School District*, No. 3:22-CV-00520-LRH-CLB, 2024 WL 196523 (D. Nev. Jan. 18, 2024), instructive on the question of when government conduct constitutes an adverse action. In that case, a high school student and her parent alleged that a coach retaliated against the student after her parent criticized the coach's coaching decisions. *Id.* at *5. They asserted that the coach

ORDER - 18

engaged in adverse actions such as reducing the student's playing time, instructing her teammates to verify her location, providing feedback in a negative manner, and, after a game, telling "the whole team to not let their parents 'talk shit' and during a practice instruct[ing] the entire team 'to stop talking to [their] fucking parents about what goes on in practice' because parents are often wrong and should 'shut the fuck up.'" *Id.* The court dismissed the plaintiffs' First Amendment retaliation claim as frivolous, reasoning that a retaliation claim requires more "egregious" government conduct such as banning parents from the school campus, improperly altering grades, or physically restraining students' freedom of movement. *Id.* (compiling cases). In comparison, the court explained, the *Johnson* plaintiffs' allegations "amount[ed] to personal grievances based upon [the p]laintiffs' subjective standards." *Id.* The court concluded that no reasonable juror could find that the coach's conduct rose to the level of an actionable adverse action against the student and parent. *Id.*; *see also Coszalter v. City of Salem*, 320 F.3d 968, 976 (9th Cir. 2003) (observing that "minor acts, such as 'bad-mouthing,' that cannot reasonably be expected to deter protected speech" do not rise to the level of an adverse action) (citing *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998)).

Here, as in *Johnson*, Mr. Mills cannot show that he was subjected to an adverse action. By Mr. Mills's own telling, Ms. Monlux approached him; told him to step away from the fence, that he was not allowed to coach, and that he was being disrespectful; said that he was damaging his child; shouted "Sue me!"; and then walked away. (Mills Decl. ¶ II.13.e.) She did not make Mr. Mills leave the match, nor did she ban him from future matches. (*See generally id.*) To the contrary, the evidence in the record shows

ORDER - 19

that Mr. Mills continued to watch the Nathan Hale match and to attend future matches, and Ms. Monlux did not approach or engage with him again. (*See* Monlux Decl. ¶¶ 16, 18, 20-21.) Viewing the evidence in the light most favorable to Mr. Mills, the court concludes that no reasonable juror could find that Ms. Monlux's conduct would "chill a person of ordinary firmness" from continuing to engage in protected speech. *See Pinard*, 467 F.3d at 770. Therefore, the court also grants Ms. Monlux's motion for summary judgment on Mr. Mills's First Amendment retaliation claim.[6]

**C.      Washington Constitutional Claim**

Mr. Mills asserts that Ms. Monlux's March 19, 2024 email message was an unconstitutional prior restraint on speech in violation of Article I, Section 5 of the Washington State Constitution. (*See* Compl. § V.B; Resp. at 34-42.) Ms. Monlux argues that she is entitled to summary judgment on this claim because her email message was not an official administrative or judicial order, was content neutral, did not address any specific expressive message, was narrowly tailored, and left open other channels for parents to communicate coaching feedback. (MSJ at 34-43.)

A prior restraint is defined as "an administrative or judicial order forbidding communications prior to their occurrence." *Ten Injured Workers v. State*, 553 P.3d 726, 732 (Wash. Ct. App. 2024) (quoting *Soundgarden v. Eikenberry*, 871 P.2d 1050, 1058 (Wash. 1994)). "'Temporary restraining orders and permanent injunctions—i.e., court

---

[6] Because the court grants summary judgment in Ms. Monlux's favor on Mr. Mills's First Amendment claims, it need not, and does not, address whether Ms. Monlux is entitled to qualified immunity.

orders that actually forbid speech activities—are classic examples of prior restraints.'" *Id.* (quoting *In re Marriage of Suggs*, 93 P.3d 161, 164 (Wash. 2004)). "Statutes that prohibit speech or expression may also be unconstitutional prior restraints." *Id.* (citing *Soundgarden*, 871 P.2d at 1065).

Here, Mr. Mills cannot establish that Ms. Monlux's March 19, 2024 email message satisfies the definition of "prior restraint." Her email message reminded parents and spectators of WIAA and Metro League rules regarding parent coaching; it was not itself an official administrative or judicial order of a government entity. (*See* 3/19/24 Monlux Email.) Mr. Mills does not direct the court to any cases finding that a statement such as the one Ms. Monlux made in her email can constitute a prior restraint on speech (*see* Resp. at 38-42), and the court has found no such cases in its own research. Therefore, the court grants Ms. Monlux's motion for summary judgment on Mr. Mills's claim under the Washington State Constitution.[7]

## IV.    CONCLUSION

For the foregoing reasons, the court GRANTS Ms. Monlux's motion for summary judgment (Dkt. # 99) and DISMISSES Mr. Mills's complaint, and this action, with prejudice.  The court DENIES Mr. Mills's motions to compel (Dkt. ## 115, 121) and

//

//

---

[7] Because the court grants summary judgment to Ms. Monlux on Mr. Mills's federal and state constitutional claims, it need not and does not consider whether Ms. Monlux is entitled to discretionary immunity or to summary judgment on Mr. Mills's requests for specific forms of relief. (*See* MSJ at 21-24 (seeking summary judgment on discretionary immunity and Mr. Mills's requests for declaratory and injunctive relief, nominal damages, and punitive damages).)

motion for leave to amend his complaint to conform his prayer for relief to the evidence (Dkt. # 128) as moot.

Dated this 12th day of August, 2026.

JAMES L. ROBART
United States District Judge

ORDER - 22